CASE 118—PETITION ORDINARY—FEBRUARY 29.

# Winchester, &c., Turnpike Road Company v. Croxton.

### APPEAL FROM CLARK CIRCUIT COURT.

1. CORPORATIONS—LEGISLATIVE INTERFERENCE WITH CHARTERS.—
The charters of corporations which are strictly private in their nature are protected from legislative interference unless the State has reserved the right to interfere, but in the case of corporations whose property is affected with a public use and which are therefore essentially public in their nature, the reservation is understood unless negatived in express words or by necessary implication.

2. POWER OF LEGISLATURE TO ALTER RATES OF TOLL FIXED IN CHARTER.—Where the charter of a turnpike road company declared that "it shall be lawful" for the president and manager to collect and receive certain rates of toll, giving them the power to increase the rates if necessary to do so in order to realize a dividend of 6 per cent., and requiring them to reduce the rates if at any time it should appear that the income and profits from the rates fixed would yield a dividend exceeding 12 per cent., these provisions did not constitute a contract so as to take from the State its power to exercise control over and limit the rates of toll and the profits of the company in the future; and therefore no contract right of this company was violated by subsequent legislation fixing lower rates of toll upon all turnpike roads.

3. SAME—DUE PROCESS OF LAW.—It does not follow that a reduction

*See note to this case as re-published in 33 L. R. A., 177.

　　of rates will cause a reduction of dividends, and in the absence of
　anything to show what effect the proposed reduction of rates will
　have on the dividends or property of the company, it can not be
　said that the corporation is deprived of its property without due
　process of law.

4. SAME.—Even if the charter provisions constituted a contract, as a
　reduction of the tolls is expressly provided for in the event it
　shall at any time appear from the abstracts of the accounts of
　the company required to be laid before the General Assembly
　each year that the rates fixed will yield an income exceeding 12
　per cent., and the company makes no disclosure as to these ab-
　stracts, it can not claim the right to be excepted from the provis-
　ions of the general statute reducing tolls.

BRECKINRIDGE & SHELBY FOR APPELLANT.

The provisions of appellant's charter as to tolls constitute a contract
　between the company and the State depriving the legislature of
　the power of regulation over the rates of toll on appellant's road.
　(Franklin County Court, &c. v. Deposit Bank of Frankfort, 87
　Ky., 380; Hamilton v. Keith, 5 Bush, 458; Stone v. Farmers' Loan
　& Trust Co., 116 U. S., 307; Sage &c. v. Dillard, &c., 15 B. Mon.,
　340; 15 B. Mon., 642; 2 Met., 598; 3 How., 145.)

　　The case of Commonwealth v. Cincinnati &c Bridge Co., 14 Ky.,
　Law Rep., 458, having been reversed by the Supreme Court of the
　United States, is not to be accepted as authority. But even under
　that decision the judgment of the circuit court is erroneous.

R. A. THORNTON ON SAME SIDE.

The act of July 6, 1893, is unconstitutional and void as to appellant,
　because,

1. It materially reduces the tolls which the legislature granted to ap-
　pellant the right to collect for all time, and thereby impairs the
　obligation of the contract between the State and the company.
　(Session Acts of 1834; Session Acts of 1893; Ky. Stats., sec. 4724;
　Chicago, &c. R. Co. v. Iowa, 94 U. S., 161; Munn v. Illinois, 94 U.
　S., 184; the Collector v. Hubbard, 12 Wall., 15; Mayor of Liverpool
　v. Tomlinson, 7 Dowl. & Ry., 556; 1 Am. and Eng. Enc. of Law, p.
　611; Stone v. Mississippi, 101 U. S., 816; Reardon v. Searcy's heirs,
　2 Bibb, 203; Charles River Bridge v. Warren Bridge, 11 Peters,
　419; City of Louisville v. Pres. & Trus. University, 15 B. Mon.,
　642; Delaware Railroad Tax Cases, 18 Wall, 206; Stone v. Farmers'
　Loan & Trust Co., 116 U. S., 307; Georgia Banking Co. v. Smith,
　128 U. S., 174; State Bank of Ohio v. Knoop, 16 How., 369; Chicago

&c. R. Co. v. Iowa 94 U. S., 155; Home of the Friendless v. Barnie, 8 Wall, 430; Ruggles v. Illinois, 108 U. S., 526; Commonwealth v. Winchester and Lexington Turnpike Road, January Term, 1879; Session Acts 1878, vol. 1, p. 140; Covington &c. Turnpike Road Co. v. Sanford, 14 Ky. Law Rep., 689.)

2. The legislature by its arbitrary action in reducing the rates of toll without a judicial investigation as to whether or not they yielded a clear dividend in excess of the maximum limit, deprived the company of its property without due process of law. (Chi· cago &c. R'y Co. v. Minnesota, 134 U. S., 418.)

BECKNER & JOUETT of counsel on same side.

WM. J. HENDRICK for appellee.

The charter of appellant does not deprive the legislature of the power to regulate the tolls to be charged upon appellant's road, and therefore the act in question does not impair the obligation of a contract. (Covington &c. Bridge Co. v. Commonwealth, 14 Ky. Law Rep., 841; Covington &c. Bridge Co. v. Kentucky, 154, U. S., 204; Shields v. Ohio, 95 U. S., 319; Waterworks v. Schottler, 110 U. S., 348; Parker v. Railroad Co., 109 Mass.; Railway Co. v. Gill, 15 S. W. Rep., 18; Bank v. Billings, 4 Pet., 561; Charles River Bridge Case, 11 Pet., 547; Hyde Park v. Fertilizing Co., 100 U. S., 548; Railroad Commission Cases, 116 U. S., 325; Georgia R. Co. v. Smith, 128 U. S., 173.)

JUDGE HAZELRIGG delivered the opinion of the court.

The question on this appeal is whether or not the appellant company has a contract with the State, entitling it to collect the tolls fixed in its charter of 1834, in spite of the legislative act of 1893, fixing uniform rates for all turnpikes in the State, and which are less than those fixed in the company's charter.

To the suit of the appellee for moneys collected of him under the charter rates in excess of the rates fixed by the recent general act the company answered, relying on sections 15 and 21 of its charter as showing an irrepealable contract, which sections are as follows:

"Section 15. It shall be lawful for the president and

managers * * * to collect and receive of and from all and every person or persons using said road the tolls and rates hereinafter mentioned, and to stop any person riding, leading or driving any horse, etc., * * * until they shall have paid toll agreeably to the following rates, to-wit: For every twenty head of sheep, hogs or other small stock, six and a fourth cents," etc.

"Section 21. And if at any time it shall appear that the clear income and profits·will not yield a dividend of six *per centum* per annum on the capital stock so expended from the time of investing the same, then it shall and may be lawful for the president and managers to increase the toll herein allowed so on each and every allowance thereof as will raise the dividend up to six *per centum* per annum; and if at any time it shall appear by the said abstracts that the said income and profits will yield a dividend exceeding twelve *per centum* per annum, then the said tolls shall be reduced so as to reduce the dividend down to twelve *per centum* per annum."

These are the only provisions particularly pleaded in the answer, though the charter is referred to and made part of the pleading. As explanatory of the reference to certain abstracts in the section last quoted, it is proper to notice section 20, which reads as follows:

"That the president and managers shall, at least once in every year after the company shall be organized, lay before the General Assembly of the Commonwealth of Kentucky during their session an abstract of their accounts, showing the amount of their capital expended in prosecution of their works, and of the incomes and profits arising from the said tolls for and during the said respective periods, together with an abstract account of the costs and charges of keeping the said road in repair, and all other contingent costs and

charges, and such other general information respecting the
company and their progress as they may think necessary to
the end that the clear annual income and profits thereof may
be ascertained and known."

It may be observed, in the first place, that no disclosures
are made in the answer relative to these yearly abstracts di-
rected to be made to the General Assembly; and it is mani-
fest that if at the rates of toll authorized by the charter a
dividend of exceeding twelve *per centum* per annum on the
capital stock actually expended in the investment, clear of
all expenses, might have been declared upon the showing
made by the abstracts, a reduction below the charter rates
was authorized, even under the express terms of the alleged
contract.    The judgment, therefore, holding the act of 1893
to be an authorized and lawful interference with the alleged
contract might be affirmed on this ground.

It is true the answer avers that at the time the rates were
collected of appellee, and many years prior thereto, "the divi-
dends of defendant were less than five per cent. of its capital
stock;" but this is quite a different thing from saying that
the annual dividends were less than five *per centum* per an-
num on the capital stock actually expended in the construc-
tion and maintenance of the road.

The importance, however, of the chief question involved
demands its settlement without regard to this defective
statement of the defense, and we shall consider briefly the
reasons urged by counsel against the correctness of the
judgment below.    The question is, do the provisions of the
charter evidence an irrevocable contract between the State
and the corporation?

We have here a private corporation, and the law would or-
dinarily denominate its charter a contract, within the mean-
ing of the Federal Constitution, between the State and the

corporation, and any alteration or modification impairing it would be repugnant to both State and Federal Constitutions. Ordinarily, to authorize such alteration there must be an express reservation of power to make it. But the property of the corporation in this instance is affected with a public use. Its corporate nature is essentially public, and the rule is that the charters of such corporations are not protected from legislative interference unless in unmistakably clear language the State has indicated a deliberate purpose not to interfere for all time to come.

In the case of private corporations the reservation, if available, must be expressed in the charter; in the case of public corporations, or those essentially public, the reservation is understood unless negatived in express words or by necessary implication.

As said in the Delaware Railroad Tax Case, 18 Wall., 225, "the established rule of construction in such cases is that rights, privileges and immunities, not expressly granted, are reserved." And the language of a company's charter, requiring it "to pay annually into the treasury of the State a tax of one-quarter of one per cent. upon its capital stock," was held not to evince an intention on the part of the State to surrender its reserved power to impose subsequently a further or different tax.

In Stone v. Farmers Loan & Trust Co., 116 U. S., 325, the language involved was "that it shall be lawful for the company hereby incorporated, from time to time, to fix, regulate and receive the toll and charges by them to be received for transportation of persons or property on their railroad," etc. The contention was that "the State granted to the company, for the full term of its corporate existence, that is to say forever, the right of managing its own affairs, and regulating its charges, etc., free of all legislative control."

The claim was denied in an elaborate opinion, citing numerous decisions of that court on the subject, which need not be referred to here.

It is true, as noted by counsel, that the court in the case last cited said that the power granted was limited by the rule of the common law, which required all charges to be reasonable; and that what shall be deemed reasonable in law was nowhere indicated; that no rate was specified nor any limit set, and it is also true that the State, in the case at hand, did indicate what would be reasonable, and did set a limit, but we can not agree with counsel that thereby nothing was left for future determination by the legislature. The determination by the State that for to-day, or for an indefinite time in the future, the charge of six and a fourth cents for every twenty head of sheep driven through the gates of the company would be a reasonable charge, is not a final settlement or determination of what may be reasonble sixty years hence; and the exercise once by the State of the right to fix the rate at what was then deemed reasonable is not in itself exhaustive of this power. Admittedly the rate fixed is reasonable—the legislative will so declares—but what is reserved? What is it that the public is interested in reserving? Manifestly that the rate should *continue* reasonable, and what was to be deemed reasonable in the future the legislature was to decide, whenever it chose to act, just as it exercised the right in the first instance. It is precisely as if in front of the company's charter the State had written, "I grant you the right to charge certain fixed rates, and these may be increased or diminished within certain limits according as you make six or twelve *per centum* per annum on the capital invested. These rates and profits are reasonable, but I go no further. I do not say I shall always regard them reasonable. I reserve, as I do

not expressly barter away, the power to provide reasonable rates for the traveling public of the future."

If the State had meant otherwise it would have said that the rates as fixed herein shall remain unchanged forever, and, to sustain appellant's contention, these important words must be interpolated into the charter; and this is true, not only with reference to the special rates of toll fixed, but to the specified minimum and maximum rates of interest as well. The fixing of the tolls and the rates of interest allowable was but an expression of the legislative will that such tolls and such rates of interest were, for the time being, reasonable and lawful; and there is no promise, expressed or implied, that further and future regulation is finally abandoned by the State.

In the Stone case (116 U. S., 325) are cited cases where the character of the language used imported a contract: "Thus in Gordon v. The Appeal Tax Court, 3 How., 133, the statute was: 'That, upon any of the banks in this State complying with the conditions of this Act, the faith of the State is hereby pledged not to impose any future tax or bonus on the said banks during the continuance of their charters under this Act.'" Language equally strong and explicit was used in the case of State Bank of Ohio v. Knoop, 16 How., 369, in Bridge Proprietors v. Hoboken Co., 1 Wall., 116 and in Home of the Friendless v. Rouse, 8 Wall., 430, to indicate that the State meant to preclude itself forever after from legislative interference with rights and privileges granted. We are convinced that the General Assembly intended, by the charter in question here, merely to indicate the rates of toll then supposed to be reasonable, and to provide for a like reasonable profit, in the way of interest, without intending to abandon forever its power to exercise control over and limit the rates of toll and the profits of the company in the future.

The doctrine that the State reserved to itself its governmental functions and powers of further regulating the property and franchises of corporations created by it, where the public were affected, was announced as early as in 1830 in the case of Providence Bank v. Billings, 4 Pet., 514, and we have no reason to believe that the representatives of the State contracted in ignorance of this principle.

In Georgia Railroad and Banking Co. v. Smith, 128 U. S., 174, the language of the charter, adopted in 1833, was "that the charge of transportation or conveyance shall not exceed fifty cents per hundred pounds on heavy articles, and ten cents per cubic foot on articles of measurement for every hundred miles; and five cents per mile for every passenger."

The Supreme Court, by Mr. Justice Field, upheld the legislative act of 1879, empowering commissioners to fix the rates of transportation at less than the maximum of rates authorized by the charter, and, in the course of a thorough review of the question, said: "It (the charter) contains no stipulation, nor is any implied, as to any future action of the legislature. * * * It would require much clearer language than this to justify us in holding that, notwithstanding any altered conditions of the country in the future, the legislature had, in 1833, contracted that the company might, for all time, charge rates for transportation of persons and property over its line up to the limits there designated."

We have considered the question without reference to the case of Commonwealth v. Covington & Cin. Bridge Co., 14 Ky. Law Rep., 836, the principles of which are, in fact, conclusive of this case. That case was reversed by the Supreme Court (154 U. S., 204), because a regulation of the tolls on the bridge spanning the Ohio river was held to affect interstate commerce. It was not deemed necessary by that court to discuss the contract features involved, but whether

we regard the opinion of this court in that case as an authoritative precedent or merely as an argument, it is this court's latest expression of opinion on the subject involved, and we now approve and follow it.

The suggestion that the corporation is deprived of its property without due process of law is easily disposed of. No intimation is given in the answer of the company. as to what effect the proposed reduction of rates will have on the dividends or property of the company.

Manifestly, it does not follow that a reduction of rates will cause a reduction of dividends.   It may increase them.   But if we concede that the earnings will be decreased, we are not told to what extent the decrease may go.   We can not assume it will amount to confiscation.

The judgment below is affirmed.