GREAT NORTHERN UTILITIES CO., RESPONDENT, *v.* PUBLIC SERVICE COMMISSION ET AL., APPELLANTS.

(No. 6,679.)

(Submitted May 9, 1930. Decided July 29, 1930.)

[293 Pac. 294.]

*Mr. L. A. Foot,* Attorney General, *Mr. L. V. Ketter,* Assistant Attorney General, and *Mr. Francis A. Silver,* for Appel-

lants, submitted an original and a reply brief; *Mr. Silver* argued the cause orally.

*Messrs. Maddox & Church, Mr. Louis P. Donovan, Messrs. Gunn, Rasch, Hall & Gunn* and *Mr. E. G. Toomey,* for Respondent, submitted a brief; *Mr. M. S. Gunn* and *Mr. Toomey* argued the cause orally.

HONORABLE FRANK P. LEIPER, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, disqualified, delivered the opinion of the court.

The Great Northern Utilities Company, the plaintiff herein, is engaged in the business of furnishing natural gas to the inhabitants of the city of Shelby, Montana. The Public Service Commission of the state of Montana made an order (which is hereinafter referred to) fixing a precise rate or charge to be made by the plaintiff for its product, and requiring the plaintiff to file, on or before a certain date, its schedule of rates in accordance with such order. The plaintiff seeks, first, an injunction restraining the Public Service Commission of the state of Montana from enforcing its order; and, second, a decree adjudging such order null and void.

For convenience, the plaintiff herein will be designated as the Utility, and the Public Service Commission of Montana as the Commission. In so far as material here, the facts may be briefly summarized as follows: That the Utility is a corpo-

ration; the defendants Boyle, Dennis and Young, the Commission; and the defendant Foot, the attorney general of the state of Montana; that the city of Shelby is a municipal corporation; that in 1922 the city of Shelby duly granted to the assignor of the Utility a franchise, which was duly accepted, under which franchise the Utility acquired the right to manufacture, sell and distribute to the consumer natural gas within the corporate limits of that city; that in 1923 the Utility, in the exercise of such franchise, constructed its plant and began the sale and distribution of natural gas to the inhabitants of Shelby; that in the year 1927, the city council of Shelby granted to the assignor of the Citizens Gas Company (hereinafter referred to as the Company) a franchise similar to that theretofore granted to the Utility; that in 1928 the Company constructed a system for the distribution of natural gas in Shelby which is in part a duplication of that of the Utility; that the system of distribution of the company is being extended so that eventually it will be an entire duplication of that of the Utility; that this plant of the company was constructed and is being operated in competition with that of the Utility, without the approval of the Commission, except that the Commission has approved the schedule of charges filed by the Company, and hereinafter set forth; that Shelby is a city of about 2,500 inhabitants; that at all times the Utility, through its gas plant or system, has been, is and will continue to be able to furnish all of the gas required by all of the inhabitants of Shelby; that at the time of the construction of the plant of the Company, the Utility, with the tentative approval of the Commission, was charging for its product the following rates:

| | | | | | | | NET | | | |
|-------|---------|------|------|------|------|------|------|-----|-----|-----|
| First | 10,000 | cu. | ft. | per | month | per meter.........50¢ | per | M. | cu. | ft. |
| Next | 10,000 | " | " | " | " | " " .........45¢ | " | " | " | " |
| Next | 30,000 | " | " | " | " | " " .........40¢ | " | " | " | " |
| Next | 250,000 | " | " | " | " | " " .........35¢ | " | " | " | " |
| Over | 300,000 | " | " | " | " | " " .........30¢ | " | " | " | " |

Minimum Bill: $1.50 per month per meter.

That the Company filed with the Commission its schedule of rates for gas, which was approved by the Commission, and which charges are as follows:

| | | | | | NET |
|---|---|---|---|---|---|
| First | 10,000 | cubic feet per month | ...............35¢ per M. cu. ft. |
| Next | 10,000 | "    "    "    " | ...............30¢ "   "   "   " |
| Next | 30,000 | "    "    "    " | ...............27½¢ "   "   "   " |
| Next | 250,000 | "    "    "    " | ...............25¢ "   "   "   " |
| All over | 300,000 | "    "    "    " | ...............22½¢ "   "   "   " |

That the Company began furnishing gas in October, 1928; that at that time the Utility had 485 customers; that shortly after October, 1928, 127 of such customers of the Utility ceased to purchase gas from the Utility and became customers of the Company. Paragraphs XVII and XVIII of the complaint are: "Paragraph XVII. That this plaintiff, to prevent the loss of all of its customers or patrons, and to protect and preserve its investment in its gas plant or system, on the 8th day of November, 1928, proposed and filed with the Public Service Commission a tariff or schedule of rates 25¢ per thousand cubic feet for all consumption up to three hundred thousand (300,000) cubic feet, and 20¢ per thousand cubic feet for all quantities over three hundred thousand (300,000) cubic feet, and on November 19, 1928, this plaintiff proposed and filed with said Public Service Commission a tariff or schedule of rates, designated by said Commission as 'Schedule 4–A,' of 20¢ per thousand cubic feet up to three hundred thousand (300,000) cubic feet and 15½¢ per thousand cubic feet for all over three hundred thousand (300,000) cubic feet."

"Paragraph XVIII. That upon the filing of said Schedule 4/A, The Citizens Gas Company presented to and filed with said Public Service Commission a complaint and protest against said Schedule 4/A upon the grounds that the rates thereby proposed were 'unfair, unjust and unreasonable' to said company. That a hearing was ordered and held by the said Public Service Commission, upon its own motion, at the City of Shelby, on December 20, 1928, for the purpose of determining the reasonableness and justness of the rates proposed by this plaintiff by said schedule, designated as Schedule

4–A. At said hearing the Citizens Gas Company and twelve customers or patrons of said company appeared, claiming and contending that said rates so proposed were not remunerative or proposed in good faith but as competitive rates. This plaintiff presented evidence in support and justification of said rates under the conditions and circumstances, and thereafter, and on January 22, 1929, the said Public Service Commission, Commissioner Young dissenting, made and issued its report and order, a copy of which is hereto attached and made a part hereof as Exhibit 'C.' ''

The allegations contained in Paragraphs XVII and XVIII are in part admitted and in part denied, the answer as to these paragraphs being as follows:

''As to paragraph XVII, these answering defendants admit that the plaintiff proposed and filed with the Public Service Commission of Montana the tariffs set forth in said paragraph, but except as herein admitted the defendants deny each and every and all allegations contained in said paragraph. Admit that the Citizens Gas Company filed with said Public Service Commission a complaint and protest as in said paragraph XVIII alleged, but in this connection the defendants allege that said complaint was dismissed by the said Public Service Commission of Montana and no hearing of any kind or character was held or had thereon; admit that the Public Service Commission of Montana, upon its own motion, held a public hearing at Shelby, Montana, on December 20, 1928, to inquire into the reasonableness and justness of the rates proposed by plaintiff in its schedule 4–A, and that at said hearing the Citizens Gas Company and twelve customers thereof appeared before the said Public Service Commission and contended that the said rates proposed by plaintiff were not proposed in good faith; admit that plaintiff presented evidence to the said Public Service Commission; admit that on January 22, 1929, the said Public Service Commission made and issued its report and order, a true and correct copy of which is attached to the said 'second amended complaint' and marked exhibit 'C,' but except as hereinabove specifically

admitted the defendants deny each and every and all allegations contained in said paragraph XVIII."

It is alleged that such order of the Commission is violative of the provisions of section 20 of Article XV of the Constitution of the state of Montana, and also of the Fourteenth Amendment to the Constitution of the United States, in that the Commission is without authority to fix minimum rates; also that sections 3907 and 3908, Revised Codes 1921, violate the Fourteenth Amendment to the Constitution of the United States. These allegations are denied by the answer. The complaint alleges, and the answer admits, that the Utility has not and will not comply with such order unless it is determined in this action that such order is valid, and that, unless restrained, the attorney general will institute criminal proceedings for the enforcement of such order.

The Commission found that the schedule of rates of the Company is just and reasonable, and made the following order: "It is ordered that Schedule 4–A, sheet 2, filed by the Great Northern Utilities Company with the Commission on November 19, 1928, stating rates for natural gas service available for all classes of service at Shelby, Toole County, Montana, be not concurred in and that said Schedule 4–A, sheet 2, shall be, and it is hereby disapproved and rejected. It is further ordered that the Great Northern Utilities Company shall on or before the first day of February, 1929, file with the Commission a schedule of rates for natural gas service at Shelby, Montana, effective as of February 1, 1929, and until further order of the Commission, which schedule of rates shall be embodied in a tariff known as Tariff No. 4, as follows, to-wit:

| First | 10,000 | cubic feet per month | 35¢ per M. cu. ft. |
| Next | 10,000 | " " " " | 30¢ " " " " |
| Next | 30,000 | " " " " | 27½¢ " " " " |
| Next | 250,000 | " " " " | 25¢ " " " " |
| All over | 300,000 | " " " " | 22½¢ " " " " |

"Minimum Bill: $1.50."

Plaintiff's motion for judgment on the pleadings was granted, and a decree entered adjudging the order of the

Commission null and void and restraining the defendants from in any manner enforcing such order. The appeal is from that judgment.

It appears that, after due notice given, a hearing was held by the Commission, at which testimony was adduced, and thereafter the order in question made. Section 3901, Revised Codes 1921, requires that "A full and complete record shall be kept of all proceedings before the commission or its representatives on any formal investigation, and all testimony shall be taken down by the stenographer appointed by the commission. Whenever any complaint is served upon the commission as hereinafter provided for the bringing of actions against the commission, before the action is reached for trial the commission shall cause a certified copy of all proceedings held and testimony taken upon such investigation to be filed with the clerk of the court in which the action is pending."

Presumably the Commission performed its duty (subd. 15, sec. 10606, Rev. Codes 1921), and therefore that the testimony taken was transcribed and filed with the clerk of the trial court prior to the hearing had in that court.

By virtue of the provisions of section 3905, Revised Codes 1921, "all rates fixed by the commission shall be prima facie lawful from the date of the order until changed or modified."

In the case of *Billings Utility Co.* v. *Public Service Commission*, 62 Mont. 21, 203 Pac. 366, this court quoted with approval the following language used by the United States supreme court in the case of *Illinois Central Ry. Co.* v. *Interstate Commerce Commission*, 206 U. S. 441, 51 L. Ed. 1128, 27 Sup. Ct. Rep. 700: "The findings of the commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience."

Section 3906, Revised Codes 1921, provides the means by which the order of the Commission may be reviewed by a court. Under the provisions of this section any party to an action in a court may introduce evidence in addition to that offered before the Commission, and if the evidence offered by the

plaintiff in the hearing before the court is found to be different from that offered before the Commission, or if evidence offered before the court is additional to that offered before the Commission, then, unless stipulated to the contrary by the parties to the action, it is made the duty of the trial court to "transmit a copy of such evidence to the Commission, and shall stay further proceedings in said action for fifteen days from the date of such transmission. Upon receipt of such evidence, the Commission shall consider the same and may modify, amend or rescind its order relating to such rate or rates * * * and shall report its action thereon to said court within ten days from the receipt of such evidence," the obvious purpose of these provisions being that the Commission should first pass upon the evidence offered.

The trial court did not consider the testimony adduced at the hearing before the Commission, and no opportunity was offered for the submission of any additional testimony, for plaintiff's motion for judgment on the pleadings was granted. The rates determined upon must be just and reasonable. (Sec. 3899, Rev. Codes 1921.) This court does not have before it any testimony whatsoever. What constitutes "just and reasonable" rates must, of necessity, depend upon the facts in each case. A rate altogether just and reasonable in one instance may be most unjust and unreasonable in another. Not having the facts before us, this court is unable to determine whether the rates fixed are just and reasonable; and therefore, we hold that that matter is not before us for determination.

There are presented the question, or questions, first: Is the Commission clothed with power to fix mimimum or precise rates? If that query be answered in the negative, then ▮ our labors are ended, for the Commission is a creature of, owes its being to, and is clothed with such powers as are clearly conferred upon it by the statute. (*State ex rel. Thacher* v. *Boyle*, 62 Mont. 97, 204 Pac. 378.) On the other hand, if the Commission is so empowered, then follows the second question: Are the provisions vesting the Commission with such authority in contravention of section 20, Article XV

of the Constitution of the State of Montana, or offensive to the provisions of the Fourteenth Amendment to the Constitution of the United States? Of these in their order.

The facts reveal an unusual situation, in that the Utility is insisting upon furnishing its product (gas) to the consumer at a rate less than that which the Commission has fixed. That this is not due to the generosity of the Utility is clearly disclosed by the complaint, and further by the fact that at the time the Commission gave notice to the Utility of a hearing for the purpose of determining the reasonableness of the charge then being made, the Utility was charging 60¢ per 1000 cu. ft. for the first 10,000 cu. ft. of gas, as its base rate. Before the date fixed for the hearing, however, the Utility voluntarily reduced its base rate to 50¢ per 1000 cu. ft. for the first 10,000 cu. ft., and that was the rate in force at the time of the advent into the field of the company. The Company filed its proposed schedule of rates, fixing as its base rate 35 cents per 1,000 for the first 10,000 cu. ft. Thereafter, and on November 8, 1928, the Utility filed with the Commission its proposed schedule of rates, fixing as its base rate 25 cents per 1,000 for the first 10,000 cu. ft.; but before any action was taken upon that proposed schedule, and on November 19, 1928, the Utility filed a further proposed schedule, known as 4–A, fixing 20 cents per 1,000 cu. ft. as its base rate, scaling the charges down to 15½ cents per 1,000 cu. ft., so that the base rate proposed in the last schedule filed by the Utility is just 30 cents per 1,000 cu. ft. lower than the rate charged by it at the time the Company entered the field. Whether the original schedule of charges made by the Utility had anything to do with bringing the Company in as a competitor, while not material to this inquiry, is at least quite suggestive that possibly the Utility had been charging all that the traffic would bear. It is equally clear that a rate war is being waged, the objective being to drive the competitor from the field.

Legislation affecting public utilities, in its earlier stages, had as its chief purpose the prevention of exorbitant charges

being made for the product furnished. As the field covered by these utilities broadened, it became apparent that the public interest extended further than merely fixing of charges; that there was embraced as well the character of the service to be rendered, the kind of equipment employed; and that these things, and others, are so interdependent that one may not be intelligently regulated without control being exercised over the others.

The principle expressed by Lord Chief Justice Hale, and approved by the supreme court of the United States in many cases, some of which are: *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389, 58 L. Ed. 1011, 34 Sup. Ct. Rep. 612; *Budd* v. *New York*, 143 U. S. 517, 36 L. Ed. 247, 12 Sup. Ct. Rep. 468; *Brass* v. *North Dakota*, 153 U. S. 391, 38 L. Ed. 757, 14 Sup. Ct. Rep. 857; *Munn* v. *Illinois*, 94 U. S. 113, 24 L. Ed. 77, to the effect that when "one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created," has not changed, but the concept of it has broadened so as to meet the development of commercial progress.

"Property becomes clothed with a public interest when used in a manner to make it of public consequence and affect the community at large." (*Munn* v. *Illinois*, supra.)

"The underlying principle is that business of certain kinds holds such a peculiar relation to the public interest that there is superinduced upon it the right of public regulation." (*German Alliance Ins. Co.* v. *Lewis*, supra.)

Heretofore this court was called upon to pass upon one phase of this Act of the legislature, and in doing so, observed that by this enactment it was the purpose of the legislature "to provide a comprehensive and uniform system of regulation and control of public utilities by a specially created tribunal through which the state exercises its sovereign will." (*State ex rel. Billings* v. *Billings Gas Co.*, 55 Mont. 102, 173 Pac. 799.)

The duty of this court is to construe the law as it finds ▮▮▮▮ it. (*State ex rel. Thelen* v. *District Court,* 51 Mont. 337, 152 Pac. 475.)

Some of the rules for the interpretation of statutes, laid down by this court from time to time, are:

"In construing a statute, the words employed must be given their ordinary meaning, unless it is made apparent from their character or the context of the subject, that a different one was intended." (*Scheffer* v. *Chicago, M. & St. P. Ry. Co.,* 53 Mont. 302, 163 Pac. 565.)

"The intention of the legislature must be inferred from the plain meaning of the words. This rule must be first resorted to before resort should be had to other rules." (*Hedges* v. *County Commrs.,* 4 Mont. 280, 1 Pac. 748; *State* v. *Cudahy Packing Co.,* 33 Mont. 179, 114 Am. St. Rep. 804, 8 Ann. Cas. 717, 82 Pac. 833.)

"The legislature is presumed to have understood the meaning of the words used in legislation and that the words used were used in the common and ordinary meaning." (*Helena Light & Ry. Co.* v. *Northern Pacific Ry. Co.,* 57 Mont. 93, 186 Pac. 702.)

"While courts, in the construction of statutes, must ascertain the intention of the legislature, if possible, such intention must be inferred from the language employed in the Act, and not from any extraneous sources." (*State ex rel. Murray* v. *Walker,* 64 Mont. 215, 210 Pac. 90; *State* v. *Bowker,* 63 Mont. 1, 205 Pac. 961.)

"Wherever the language of a statute is plain, simple, direct and unambiguous, it does not require construction. It construes itself." (*Cruse* v. *Fischl,* 55 Mont. 258, 175 Pac. 878; *Scheffer* v. *Chicago, M. & St. P. Ry. Co.,* supra.)

"Statutes are to be construed so as best to effectuate the object of the legislature." (*State* v. *Millis,* 81 Mont. 86, 261 Pac. 885, and cases there cited.)

With these general principles in mind, let us examine some of the provisions of these statutes.

Section 3879, Revised Codes 1921, makes the board of railroad commissioners ex officio the public service commission.

Section 3881, Revised Codes 1921, defines what is meant by public utility, and vests the commission "with full power of supervision, regulation and control of such utilities, subject to the provisions of this Act."

By section 3882, Revised Codes 1921, the Commission is empowered "to prescribe rules of procedure, and to do all things necessary and convenient in the exercise of the powers by this Act conferred," but is denied judicial powers, and reserves to everyone the right to test in "any court of competent jurisdiction, the legality or reasonableness of any fixed order made by the commission."

Section 3883, Revised Codes 1921, provides: "Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility for any heat, light, power, water, telegraph or telephone service, produced, transmitted, delivered or furnished, or for any service to be rendered as, or in connection with any public utility shall be reasonable and just, and every unjust and unreasonable charge is prohibited and declared unlawful."

Not only must the charge be "just and reasonable," but the service and facilities for rendering that service must be adequate.

Under section 3884, Revised Codes 1921, the Commission is authorized to ascertain the value of the property of the Utility "actually used and useful for the convenience of the public," and is furnished with the means of procuring the information requisite to such ascertainment, and is empowered to make a revaluation of that property.

Further, to the end that the Commission may be advised of the character and volume of the business transacted by any Utility, of its income, of the expense of running its business, the Commission is empowered to require the Utility to use a particular form, or forms, in keeping its books and in making its reports to the Commission. The Utility is forbidden to remove any of its records from the state except with the

consent of the Commission. (Sec. 3885, Rev. Codes 1921.) The time at which the public utility shall close its business for the year is determined, and the Utility is required to file with the Commission full reports annually, and these reports shall be in such form as is prescribed by the Commission, and "shall contain all the information deemed by the Commission necessary for the proper performance of its duties." If the reports do not contain all of the information desired by the Commission, then the Commission may require the Utility to furnish such additional information as the Commission deems necessary. (Sec. 3886, Revised Codes 1921.) The Commission is empowered, either itself or by such agents as it may appoint, to "examine the books, accounts, records and papers of any public utility for the purpose of determining their correctness and whether they are being kept in accordance with the rules and system prescribed by the Commission." (Sec. 3887, Rev. Codes 1921.)

Under section 3890, Revised Codes 1921, the Commission is authorized to "prescribe for each kind of public utility suitable and convenient units of product or service"; to "fix adequate and serviceable standards for the measurement of quality, pressure, initial voltage or other conditions pertaining to the supply of the product or service rendered"; to "provide for the * * * testing of any and all appliances used in the measuring of any product * * * of a public utility." In the same section, the Commission is authorized to purchase such apparatus as may be essential in carrying out the provisions of the Act, and any member of the Commission, or its agents, are empowered to enter upon the premises of any public utility for the purpose of making the examinations and tests as provided in the Act, and to use in making such tests or examinations the apparatus of the Commission.

By section 3891, Revised Codes 1921, provision is made for the filing of the original schedule of rates with the Commission, and a limitation is placed upon the charge therein to be made. That section provides in part:

"Every public utility shall file with the commission, within a time fixed by the commission, schedules which shall be open to public inspection, showing all rates, tolls, and charges which it has established, and which are in force at the time, for any service performed by it within the state, or for any service in connection therewith, or performed by any public utility controlled or operated by it. The rates, tolls, and charges shown on such schedules shall not exceed the rates, tolls, and charges in force at the time of passage of this Act * * * .

"No change shall thereafter be made in any schedule, including schedules of joint rates, except upon twenty days' notice to the commission, and all such changes shall be plainly indicated upon existing schedules, or by filing new schedules in lieu thereof ten days prior to the time the same are to take effect; provided, that the commission, upon application of any public utility, may prescribe a less time within which a reduction may be made; *provided, however, that no advance or reduction of existing schedules shall be made without the concurrence of the commission."*

Under the provisions of section 3892, Revised Codes 1921, it is made "unlawful for any public utility to charge, demand, collect, or receive a *greater or less compensation for any service performed by it* within the state, or for any service in connection therewith, than is specified in such printed schedules * * * as may at the time be in force, or to *demand, collect, or receive any rate, toll, or charge not specified in such schedules.* The rates, tolls, and charges named therein shall be the lawful rates, tolls, and charges until the same are changed, as provided in this Act." Rebating, and the granting of any special privilege to any consumer or user, is forbidden.

By virtue of the provisions of section 3897, Revised Codes 1921, complaint may be filed against the Utility by numerous agencies and persons enumerated, and when any complaint is made concerning "any of the rates, tolls, charges or sched-

ules * * * are in any way unreasonable * * * or that any regulations * * * practices or act whatsoever affecting or relating to the production, transmission or delivery or furnishing of heat, light, water * * * or any service in connection therewith * * * is in any respect unreasonable, insufficient * * * or that any service is inadequate," it is made the duty of the Commission to proceed, either with or without notice, to make such investigation as the Commission may deem necessary. This Act further provides for the notice to be given to the Utility, as well as to the complainant, of the time and place of any hearing to be held; and provides for the procurement of witnesses; but "no order affecting such rates, tolls, charges, schedules, regulations, measurements, practice, or act complaint[ed] of shall be entered without a formal hearing."

Section 3895, Revised Codes 1921, provides in part: "The commission shall have authority to inquire into the management of the business of all public utilities, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from any public utility all necessary information to enable the commission to perform its duties."

Under the provisions of section 3899, Revised Codes 1921, a like complaint may be made by the public utility; or "the commission may at any time, upon its own motion, investigate any of the rates, tolls, charges, rules, regulations, practices, and service, after a full hearing, * * * by order make such changes as may be just and reasonable, the same as if a formal complaint had been made." This section further provides that if, upon the hearing, the rates, tolls, charges or schedules are found to be unjust or unreasonable; or if it be found. that any "regulation, measurement, practice, act or service complained of is unjust, unreasonable, insufficient * * * or otherwise in violation of the provisions of this Act, or if it be found that the service is inadequate, or that any reasonable service cannot be obtained," the Commission shall have power to substitute therefor such other regulations,

measurements, practices, service or acts, and make such order relating thereto, as may be just and reasonable.

It will be noted that by these provisions of our statute, ▮ above quoted, the Commission is required not only to regulate charges, but it is likewise made its duty as well to see to it that reasonable service is rendered, and that the equipment is reasonably adequate. It is apparent that the legislature intended to clothe the Commission with power to supervise the acts of the Utility in matters other than rate fixing. The legislature evidently reasoned that intermittent service is as costly, and at least equally detrimental to the public interest, as is an exorbitant charge for the service.

After the initial schedule of rates, together with the rules ▮ and regulations, have been filed with the Commission, how may a change therein be effected? It is the contention of the Utility that the schedule of rates may be changed by filing with the Commission the proposed new schedule, and giving the twenty days' notice provided by section 3891. It is further contended that the sole purpose of that provision is to give notice to the Commission of the change, and that the proposed schedule of rates becomes effective without any act on the part of the Commission.

With that contention we cannot agree. In the case of *State* v. *Boyle,* supra, this court remarked: "Every word, phrase, clause and sentence in an Act must be given meaning if it is possible to do so." If this statute be construed in accordance with the interpretation placed thereon by the Utility, then the words in section 3891, supra, "provided, however, that no advance or reduction of existing schedules shall be made without the concurrence of the commission," are utterly meaningless, because the provisions of section 3891, immediately preceding that part thereof last above quoted, provide for the giving of notice to the Commission. For this court to say that the Utility may change its rates by merely filing with the Commission a notice, or that the Commission acts merely in a ministerial capacity in connection with the proposed change, and that the Commission has no discretion in

the matter, we must ignore the plain language of the statute, and run counter to every rule of statutory construction.

Concurrence is defined as: "Concurrence in opinion; agreement." (Century Dictionary.) "A meeting of minds; agreement in opinion; consent." (Webster's Dictionary.) "Agreement in mind or opinion; consent; approbation; approval; to come together in opinion or action." (Standard Dictionary.)

In the case of *Northern Pacific Ry. Co.* v. *Bennett,* 83 Mont. 483, 272 Pac. 987, this court quoted with approval the language of the supreme court of New York in the case of *People* v. *Grant,* 126 N. Y. 473, 27 N. E. 964, as follows:

"The requirement that a person must secure leave from someone to entitle him to exercise a right carries with it, by irresistible implication, a discretion on the part of the other to refuse to grant it, if in his judgment it is improper or unwise to give the required consent."

Subject to the provisions of the Utility Act, the Commission is given power to supervise, regulate and control public utilities. The Constitution of the United States grants to Congress power to regulate commerce between the states. Regarding this power of regulation, the supreme court of the United States, speaking through Mr. Chief Justice Taft, in the case of *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456, 68 L. Ed. 388, 44 Sup. Ct. Rep. 169, says:

"To regulate in the sense intended is to foster, protect and control the commerce, with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety."

In support of the construction placed by the Utility upon section 3891, supra, the case of *Wichita R. R. & L. Co.* v. *Public Utilities Commission,* reported in 260 U. S. 48, 67 L. Ed. 124, 43 Sup. Ct. Rep. 51, is relied upon. In that case a provision of the Kansas Utility Act, somewhat similar to the provisions of section 3891, supra, is commented upon. Briefly stated, the facts in that case are: That in 1910 the Kansas company contracted with the Wichita company that the latter would furnish to and the former agreed to accept and pay for

electrical energy at certain rates until 1930. The Utility Act of Kansas was passed in 1911. The contract between these two concerns was fulfilled by both until 1918, when the Kansas company petitioned the Public Utilities Commission of Kansas to lower the contractual rate. This the Commission did. Thereupon the Wichita company brought an action in the federal court against the Commission seeking to restrain it from putting into effect its order. The Kansas company intervened. The district court sustained a motion for judgment on the pleadings, and issued the injunction, basing its action upon the ground that the Commission had failed to make a finding that the rates in force were unreasonably low in compliance with the Kansas Utility Act. The circuit court of appeals reversed the order of the district court. The supreme court of the United States, speaking through Mr. Chief Justice Taft, reversed the order of the circuit court, and affirmed that of the district court. In that case counsel for the Kansas company contended that all that was necessary to do in order to change the rate fixed by the contract was to file a schedule showing such change with the Commission; but, as pointed out by Mr. Chief Justice Taft, that might not be done in that case because of the contractual relation existing between the Wichita company and the Kansas company, without a hearing being held, suitable findings made by the Commission, followed by its order. Therein Mr. Chief Justice Taft says:

"It is said that the order in this case was authorized by section 20 [of the Public Utilities Act] and therefore that all that was needed was the filing of a schedule of change of the rates and the consent of the Commission, and that no finding was required. * * * This construction of section 20 is doubtless correct, but it shows that the filing of a schedule of change of rates under that section cannot accomplish the result of abrogating contract rates. It could not do so any more than would the original filing of a schedule of rates under § 11 requiring every public utility to publish and file with the Commission the schedules of rates, do this. The

consent of the Commission in section 20 is made necessary in order to prevent changing schedules without notice to the Commission and thus to secure a proper supervision of schedules. Such consent does not involve a hearing or a finding and a decision.''

It will be noted that a decision construing section 20 of the Kansas Act was not requisite to a determination of the questions before the court, except in so far as to determine whether or not a compliance with the provisions of section 20 of the Kansas Utility Act was sufficient to abrogate contractual rates. Anything that is said further than that is *obiter dictum.* The disputed question in the instant case was not before the court in that case at all, and therefore our conclusion in this case is not in anywise in conflict with that expressed by Justice Taft.

Neither can it be said that the Utility has no redress in the event that the Commission refuses to concur in a proposed new schedule of rates, for, under the provisions of section 3899, supra, it may make complaint, and thereupon a hearing must be held and an order thereafter made, the effect of which must be just and reasonable, whether in regard to rates, or service, or what not.

Section 3881, supra, takes from cities and towns the power to supervise, regulate and control public utilities, and lodges that authority in the Commission. In the state of Iowa, these regulatory powers are lodged in the municipality under section 6143 of the Code of that state, which provides in part as follows:

''They [municipal corporations] shall have power to * * * and to regulate and fix the rent or rate for water, gas, heat, light, or power; to regulate and fix the rents or rates of water, gas, heat and electric light or power; to regulate and fix the charges for water meters, gas meters, electric light or power meters, or other device or means necessary for determining the consumption of water, gas, heat, electric light or power, and these powers shall not be abridged by ordinances, resolution or contract.''

In the case of *Incorporated Town of Mapleton* v. *Iowa Public Service Co.* (Iowa), 223 N. W. 476, the supreme court of Iowa had under consideration the powers conferred by this statute upon the town of Mapleton in the matter of fixing precise rates for electric current. The plaintiff passed an ordinance fixing a rate at which defendant's product might be sold. Defendant sold its product to the consumer at a lower rate than that fixed by the ordinance of the plaintiff, and action was commenced to compel the defendant to conform its charges to the rate fixed by the plaintiff's ordinance. The defendant contended that, while the plaintiff was authorized to fix a maximum rate, it was without the power to fix precise rates. The supreme court in that case said:

"The defendant contends for an interpretation of this section to the effect that it fixes only a maximum rate, beyond which the utility company may not go, and that it does not forbid the exaction of a lower rate than is thus fixed by the ordinance. On the other hand, the plaintiff contends for a literal interpretation of the statute, to the effect that power is conferred upon the city council to regulate and fix the rates. Elaborating a little further the defendant's argument, it is that the rate fixed by the ordinance is presumptively reasonable as a maximum rate; that if 13 cents is a reasonable rate, then any rate below 13 is necessarily reasonable; that the only function of the city council is to fix a reasonable rate; that, if the defendant maintains a reasonable rate, it puts itself beyond the power of interference by the plaintiff. The counter contention of the plaintiff is that only the 13-cent rate is presumptively reasonable, and that the burden is upon the defendant to show it to be unreasonable, before it can assert a right to make another rate, be it higher or lower. * * * The result is that this plaintiff in its governmental capacity has within it two public utilities. The question is, may they compete in rates? If so, to what extent? Does section 6143 cease to operate in such a case? Has the city council any power of regulation, provided the battle field is below the snow line? Has the city, in its governmental capacity, any

interest to be subserved by stopping a rate war? * * *
Its further argument is that it has a right to manage its
own property in accord with its own policies, subject only to
a maximum rate; * * * Does section 6143 in terms em-
power the city council to fix a 'top' rate, which shall be both
maximum and minimum? * * * The fundamental propo-
sition in the defendant's argument is that, subject to the right
of the municipality to impose upon it a reasonable maximum
rate, its constitutional right, as the owner of the property, to
adopt its own policies and to enforce its own methods, and to
compete with its competitor, and to win or lose thereby, is
absolute. The proposition is not wholly tenable. The owner
of private property, voluntarily devoted to public use, neces-
sarily surrenders some of his rights, and subjects himself to
reasonable municipal regulation. The major right thus sur-
rendered by him is that of fixing the price of his service or
commodity. The Constitution protects him against confisca-
tion by guaranteeing him that the price fixed by the municipal-
ity shall not be unreasonable. The defendant recognizes that
the municipality may set a maximum limitation upon
it. * * *

"The argument at this point is that, if the two competitors
were to agree together not to compete, such agreement would
be void as a fraud upon the public, and as creating a monop-
oly. When the owner of private property devotes it to the
public use, as herein, he voluntarily retires from the field of
competition, so far as the question of rates is concerned. It is
the public, as patron, which is interested in free competition.
A municipality is the representative of the public *pro tanto*.
When it exercises the power of fixing rates, it waives compe-
tition and establishes a quasi monopoly. In the field of un-
regulated enterprises, competition tends to secure reasonable
prices. A public utility becomes, by the common consent of
owner and the public, a monopoly. The evil which would
ordinarily arise therefrom is avoided by public regulation. It
does not result in unreasonable prices, because the public tri-

bunal is charged with the duty of fixing reasonable ones.
\* \* \*

"But it is argued that, when the public utility accepts the limitation of a maximum price, it must then be deemed at liberty, in the field of lower prices, to compete with its competitor when it has one, and to do so by the cutting of rates, and that this is no concern of the municipality. The presence of two public utilities in one little town is one of the anomalies of this case. Inasmuch as both are regulated, the municipality has no need of a competition of rates in order to avoid a monopoly. Has the municipality any interest in restraining a rate war between the two utilities? A little town with two utility companies might be likened to the owner of a menagerie, whose wild animals are prone to fight, if they come to contact. It is quite to the interest of the owner to prevent the contact. Moreover, the municipality, which exercises the power over a public utility to fix its rates, owes a corresponding duty to protect such utility against unfair competition by reason of such regulation. The railway legislation of the country gives universal recognition to this principle. Rates fixed under the supervision of the Railway Commission must be adhered to by every carrier. The rate charged must be neither greater nor less than that fixed in the schedule. We think that the plaintiff may likewise enforce its ordinance rates." (See, also, *City of Tipton* v. *Tipton Light & Heating Co.*, 176 Iowa, 224, 157 N. W. 844; *Pinney & Boyle Co.* v. *Los Angeles Gas & Elec. Co.*, 168 Cal. 12, Ann. Cas. 1915D, 471, L. R. A. 1915C, 282, 141 Pac. 620; *Economic Gas Co.* v. *City of Los Angeles*, 168 Cal. 448, Ann. Cas. 1916A, 931, 143 Pac. 717.)

It is argued that, if just and reasonable rates are those which furnished a fair return upon the present value of the property used, and useful, in furnishing the service, then, where there are two utilities, one a duplicate of the other, and where one can serve all the needs of that community, a double charge will result. That question is not before us; but, if the argument be true, then it might with perfect propriety be addressed to the legislative branch of our government.

Many of the states have enacted statutes designed to prevent the very situation now existing at Shelby, by requiring a utility, before it commences the construction of any part of its plant, to procure from the Commission a certificate of public necessity or convenience. Thus far, our legislature has enacted no such statute, and, therefore, the Commission may not prevent several utilities, each dealing in the same product, from entering the same field, although one may be amply sufficient to serve the needs of such community.

We are of the opinion, therefore, that it was the intention of the legislature to clothe the Commission with the power to fix the precise rate to be charged by the Utility for its commodity.

Any order made by the Commission must be just and reasonable. What is a reasonable charge, or a just and reasonable order, must depend upon the facts in each case. What a utility is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public (*Minnesota Rate Cases*, 230 U. S. 352, 57 L. Ed. 1511, 33 Sup. Ct. Rep. 729; *Smyth* v. *Ames*, 169 U. S. 466, 42 L. Ed. 819, 18 Sup. Ct. Rep. 418; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 53 L. Ed. 382, 29 Sup. Ct. Rep. 192); and this should include sufficient to enable the Utility out of such revenue to keep in reasonable repair its equipment so as to render reasonable service.

The reasonable service which the statute requires the Utility to furnish, and which it is made the duty of the Commission to see is furnished, must be paid for out of the revenues derived from the sale of the product of the Utility. "Service without compensation cannot be compelled without violating the federal Constitution." (*Indianapolis Gas Co.* v. *Indianapolis*, 82 Fed. 245; *St. Louis & San Francisco Ry. Co.* v. *Gill*, 156 U. S. 649, 39 L. Ed. 567, 15 Sup. Ct. Rep. 484.) It is an inexorable law that if more is taken out than is put in, regardless of how large the surplus, the supply will eventually be exhausted. Thus, if the Utility may sell its

product at a loss, then the provisions of the statute are rendered impotent, for the Commission is unable to regulate the character of service to be rendered.

It is next insisted by the Utility that the Act of the legislature in question is unconstitutional, in that it is violative of section 20 of Article XV of the Constitution of the State of Montana. That section of our Constitution provides:

"No incorporation, stock company, person or association of persons in the State of Montana, shall, directly or indirectly, combine or form what is known as a trust, or make any contract with any person or persons, corporation, or stock company, foreign or domestic, through their stockholders, trustees, or in any manner whatever, for the purpose of fixing the price, or regulating the production of any article of commerce, or of the product of the soil, for consumption by the people. The legislative assembly shall pass laws for the enforcement thereof by adequate penalties to the extent, if necessary for that purpose, of the forfeiture of their property and franchises, or in case of foreign corporations, prohibiting them from carrying on business in the state."

In conformity with the above provisions of our Constitution, the legislature enacted section 10901, Revised Codes 1921.

The Constitution of Montana is not a grant of power, but rather a limitation upon powers exercised by the several departments of the state government. (*Hilger* v. *Moore,* 56 Mont. 146, 182 Pac. 477; *McClintock* v. *City of Great Falls,* 53 Mont. 221, 163 Pac. 99; *Edwards* v. *County of Lewis and Clark,* 53 Mont. 359, 165 Pac. 297; *State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708, 186 Pac. 697; *State ex rel. Smith* v. *District Court,* 50 Mont. 134, 145 Pac. 721; *Northern Pacific Ry. Co.* v. *Mjelde,* 48 Mont. 287, 137 Pac. 386; *Heckman* v. *Custer County,* 70 Mont. 84, 223 Pac. 916.)

In speaking of the interpretation to be placed upon the language used in the Constitution of Massachusetts, the supreme court of that state, speaking through Mr. Chief Justice Parker, in the case of *Henshaw* v. *Foster,* 9 Pick. (26 Mass.) 312, says: "We are to suppose that those who were

delegated to the great business of distributing the powers which emanated from the sovereignty of the people, and to the establishment of rules for the perpetual security of the rights of person and property, had the wisdom to adapt their language to future as well as existing emergencies; so that words competent to the then existing state of the community, and at the same time capable of being expanded to embrace more extensive relations, should not be restrained to their more obvious and immediate sense, if consistently with the general object of the authors and the true principles of the compact, they can be extended to other relations and circumstances which an improved state of society may produce." That language is quoted with approval by this court in the case of *State ex. rel. Fenner* v. *Keating,* 53 Mont. 371, 163 Pac. 1156, in which it is said: "The proper interpretation of any constitutional provision requires us to remember that it is a part of the organic law—organic not only in the sense that it is fundamental, but also in the sense that it is a living thing designed to meet the needs of a progressive society, amid all the detail changes to which a progressive society is subject." In the same case this court observed: "In the case of statutes passed by the legislative assembly and assailed as unconstitutional, the question is not whether it is possible to condemn, but whether it is possible to uphold. We stand committed to the rule that a statute will not be declared unconstitutional unless its nullity is placed, in our judgment, beyond reasonable doubt." The following cases bear upon the same subject: *State ex rel. Lyman* v. *Stewart,* 58 Mont. 1, 190 Pac. 129; *Wheeler & Motter Merc. Co.* v. *Moon,* 49 Mont. 307, 141 Pac. 665; *State ex rel. Cryderman* v. *Wienrich,* 54 Mont. 390, 170 Pac. 942; *In re O'Brien,* 29 Mont. 530, 1 Ann. Cas. 373, 75 Pac. 196; *Hilburn* v. *St. Paul, M. & M. Ry. Co.,* 23 Mont. 229, 58 Pac. 551, 811; *State ex rel. Public Service Commission* v. *Brannon,* 86 Mont. 200, 283 Pac. 202.

"In determining the constitutionality of statutes, courts look beyond the mere form of expression to the object and

purpose of the legislation." (*Pohl* v. *Chicago, M. & St. P. Ry. Co.*, 52 Mont. 572, 160 Pac. 515.)

The thing which the framers of our Constitution intended "is to be ascertained not merely from the language used, but in the light of our history, the surrounding circumstances, the subject matter under consideration, and the object sought to be attained." (*State ex rel. McGowan* v. *Sedgwick*, 46 Mont. 187, 127 Pac. 94; *State ex rel. Hillis* v. *Sullivan*, 48 Mont. 320, 137 Pac. 392.)

"The authority of the legislature, otherwise plenary, will not be held to be circumscribed by mere implication. He who seeks to limit the power of the lawmakers must be able to point out the particular provision of the Constitution which contains the limitation expressed in no uncertain terms." (*State ex rel. Evans* v. *Stewart*, 53 Mont. 18, 161 Pac. 309; *Hilger* v. *Moore*, supra.)

The "object sought to be attained" by the framers of our ▆▆▆ Constitution and the people of this state in the adoption of that Constitution was not that every combination was proscribed, nor that the making of every contract was forbidden; but rather that it was the purpose to forbid the formation of a combination, or the making of a contract, if the purpose of such combination or contract was to fix the price or regulate the production of any article of commerce so as to unlawfully take advantage of the public. If the phrase "fix the price" were to be literally construed, then the Commission may not fix a maximum, a minimum, or a precise price, or any price, upon the commodity known as gas. But it is conceded that a maximum price may be fixed by the Commission, and the principle upon which that concession rests is firmly established by many authorities, some of which are: *Munn* v. *Illinois,* supra; *Dayton-Goose Creek R. Co.* v. *United States,* supra; *German Alliance Ins. Co.* v. *Lewis,* supra; *Winchester & L. Turnpike Road Co.* v. *Croxton,* 98 Ky. 739, 34 S. W. 518; *Adkins* v. *Children's Hospital,* 261 U. S. 525, 67 L. Ed. 785, 43 Sup. Ct. Rep. 394.

This court, speaking through Mr. Chief Justice Brantly, in the case of *MacGinniss* v. *Boston & Montana C. C. & S. Min. Co.*, 29 Mont. 428, 454, 75 Pac. 89, 95, says: "Section 20 (of Article XV, Constitution) prohibits any combination or contract which has a particular purpose, to-wit, 'fixing the price or regulating the production of any article of commerce, or of the product of the soil, for consumption by the people.' The terms 'combine' and 'form a trust' were evidently intended to be read in connection with the expression 'for the purpose,' etc., clearly implying that, in order to subject offenders to the severe penalties which the legislature might impose, there must be shown a specific intent to do the prohibited act, or that the association or combination necessarily tends to accomplish the same result. That this is the meaning is clear from the enumeration of persons who may not do the prohibited acts. Corporations, stock companies, natural persons, or partnerships are all included. If the criminal intent is not a necessary ingredient of the evil denounced, then all sorts of combinations are to be deemed prohibited, even ordinary copartnerships, as coming within the letter of the prohibition."

And in the same case, speaking of section 10901, supra, as well as section 20, Article XV, of the Constitution, it is said: "The section of the statute quoted involves the same idea and demands the same construction, though it is more specific in its provisions, and extends to and includes combinations in restraint of competition in transportation. It denounces every form of combination or contract *which has for its purpose,* directly or indirectly, the restraint of production or trade in any way or manner, or the *control of the price of any article of consumption by the people.*" Continuing, the court says: "It was not the purpose of the convention, or of the legislature, to limit either the term used in the Constitution, or in the statute, by any narrow definition, but to leave it to the courts to look beneath the surface, and, from the methods employed in the conduct of the business, to determine whether the association or combination in question, no matter what

its particular form should chance to be, or what might be its constituent elements, is taking advantage of the public in an unlawful way. (Citing the case of *Harding* v. *American Glucose Co.*, 182 Ill. 551, 74 Am. St. Rep. 189, 64 L. R. A. 738, 55 N. E. 577.) In each case, therefore, under these provisions, the nature of the arrangement or combination is a question of fact to be determined by the court, from the evidence before it, or from the vice which inheres in the contract itself.''

Can it be said that the "arrangement" intended by the Act of the legislature in question was the "taking advantage of the public in an unlawful way"? We think not. The purpose, as hereinbefore stated, is to determine a price which shall be just and reasonable to all concerned—the Utility as well as the consumer—and to insure to the consumer reasonable service, and to the Utility a reasonable return. We believe that this court would be derelict in its duty were it to hold that by implication the people of this state surrendered a right so valuable to them as that clearly expressed by the Utility Act in question. And, therefore, we are impelled to the conclusion that Chapter 260, Revised Codes 1921, is not violative of the provisions of section 20 of Article XV of the Constitution of the state of Montana.

We have determined that, under the provisions of our statute, supra, the Commission is empowered to fix precise rates, and that these provisions are not offensive to the Constitution of the state of Montana. There remains the question whether the "due process of law" clause of the Fourteenth Amendment to the federal Constitution is violated thereby.

Speaking of the duty of courts in passing upon the constitutionality of a statute, the supreme court of the United States, in the case of *Munn* v. *Illinois*, supra, says: "Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained.''

That part of the Fourteenth Amendment under consideration is: "Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The wording of the Fifth Amendment to the United States Constitution is somewhat similar. It provides in part: "No person * * * shall be deprived of life, liberty or property without due process of law." The Fifth Amendment to the United States Constitution was adopted in 1798; the Fourteenth Amendment, in 1868. The former is a limitation upon the powers of Congress; the latter, a restriction upon the powers of the states. It is conceded that legislation may be enacted determining the maximum charge to be made by a public utility; but the specific objection here is that to fix a precise rate is violative of the Fourteenth Amendment to the Constitution of the United States in that it deprives the Utility of its constitutional right of freedom of contract in relation to its property. In so far as we are advised, this precise question has never been passed upon by the supreme court of the United States. The fact is that the situation out of which these questions grow in this case is quite novel. But the fact that this question may not have heretofore arisen, or that it has not been finally determined by the supreme court of the United States, is not proof absolute that the power does not exist, or that the legislature is prohibited from exercising such power by reason of the inhibitions of the Fourteenth Amendment.

The underlying principle by which the sovereign is given any right to regulate a utility, as hereinbefore noted, is "that business of certain kinds holds such a peculiar relation to the public interest that there is superinduced upon it the right of public regulation." In the case of *German Alliance Ins. Co.* v. *Lewis,* supra, it is said: "It would be a bold thing to say that the principle is fixed, inelastic, in the precedents of the past, and cannot be applied though modern economic conditions may make necessary or beneficial its application.

In other words, to say that government possessed at one time a greater power to recognize the public interest in a business and its regulation to promote the general welfare than government possesses today." Continuing, the court said: "The power to regulate interstate commerce existed for a century before the interstate commerce act was passed, and the commission constituted by it was not given authority to fix rates until some years afterwards. Of the agencies which those measures were enacted to regulate at the time of the creation of the power, there was no prophecy or conception. It was exerted only when the size, number and influence of those agencies had so increased and developed as to seem to make it imperative. Other illustrations readily occur which repel the intimation that the inactivity of a power, however prolonged, militates against its legality when it is exercised. * * * It is oftener the existence of necessity rather than the prescience of it which dictates legislation."

The *Munn Case*, supra, was decided in 1877, or nine years after the Fourteenth Amendment became effective. In that case the court, after reviewing somewhat the history of the regulation of public utilities, and apparently for the purpose of emphasizing the fact that the Fourteenth Amendment had added no prohibitions to the powers theretofore exercised by Congress, says: "With the 5th Amendment in force, Congress, in 1820, conferred power upon the City of Washington 'to regulate * * * the rates of wharfage at private wharves, * * * the sweeping of chimneys, and to fix the rates of fees therefor, * * * and the weight and quality of bread,' * * * 'to make all necessary regulations respecting hackney carriages and the rates of fare of the same, and the rates of hauling by cartmen, wagoners, carmen and draymen, and the rates of commission of auctioneers' * * * From this," the court continues, "it is apparent that, down to the time of the adoption of the 14th Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of

law. Under some circumstances they may, but not under all. The amendment does not change the law in this particular; it simply prevents the states from doing that which will operate as such a deprivation.''

In other words, the Fourteenth Amendment merely prevents the states from depriving any person of property without due process of law. Counsel for the Utility contend that the *Munn Case* is decisive of this. We think not. The question presented for determination in that case was whether or not the legislative department of the state of Illinois could fix the maximum charge to be made by an elevator storing grain. That this was the precise question there presented is clearly stated by Mr. Chief Justice Waite in the first paragraph of the opinion, from which we quote: ''The question to be determined in this case is whether the General Assembly of Illinois can, under the limitations upon the legislative power of the states imposed by the Constitution of the United States, fix by law the maximum of charges for the storage of grain in warehouses at Chicago.'' Quoting further from that case: ''The controlling fact is the power to regulate at all. If that exists, the right to establish the maximum of charge, *as one of the means of regulation,* is implied.''

From the language used by the Chief Justice, it is fair to assume that other regulatory powers beside that of fixing the maximum charge might be exercised; but what the other ''means of regulation'' are is not commented upon, because not properly before the court. Neither was the question whether or not the legislature of Illinois might, by appropriate legislation, authorize the fixing of a precise charge necessary to a determination of the issues in that case. It is true, and fairly illustrative of changing conditions, that very able counsel for the plaintiff in that case, in their brief, stated: ''If there is power to fix a maximum price, there is power to fix a minimum price, or to prescribe an arbitrary sum, without any flexibility whatever.''

The court in the *Munn Case* further observed: ''To limit the rate of charge for service rendered in a public employment,

or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one. We know that this is a power which may be abused; but that is no argument against its existence. For protection against abuses by legislatures the people must resort to the polls, not to the courts.''

The supreme court of the United States, in the case of *Hurtado* v. *California*, 110 U. S. 516, 558, 28 L. Ed. 232, 4 Sup. Ct. Rep. 111, 292, in speaking of the Fifth and Fourteenth Amendments to the Constitution of the United States, says: ''Due process of law in the latter (5th Amendment) refers to that law of the land, which derives its authority from the legislative powers conferred upon Congress by the Constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law. In the 14th Amendment, by parity of reason, it refers to that law of the land in each state, which derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws, and alter them at their pleasure.''

''The requirement of due process of law was introduced into the Constitution of the United States by the fifth amendment as a limitation upon the powers of the national government, and by the fourteenth amendment as a guaranty against any encroachment upon an acknowledged right of citizenship by the legislatures of the states. Since similar phrases in providing this guaranty appear in the two amendments, a similar meaning and effect have been given in the interpretation of each.'' (6 R. C. L., sec. 436, p. 440, and cases there cited.)

As above noted, the Fifth Amendment to the Constitution of the United States places the same inhibitions upon the Congress as are placed upon the states by the Fourteenth Amendment. Section 8 of Article I of the Constitution of

the United States empowers Congress to regulate commerce among the several states. But, certainly, the power granted to Congress to regulate commerce must be exercised within the limitations placed upon it by the provisions of the Fifth Amendment to the Constitution of the United States. In other words, Congress, in the exercise of its authority to regulate commerce among the states, may not violate the provisions of the Fifth Amendment to the Constitution.

The supreme court of the United States, in the case of *Adair* v. *United States*, 208 U. S. 161, 52 L. Ed. 436, 28 Sup. Ct. Rep. 277, says: "We need scarcely repeat what this court has more than once said, that the power to regulate interstate commerce, great and paramount as that power is, cannot be exerted in violation of any fundamental right secured by other provisions of the Constitution." (Citing cases.)

But Congress, by the enactment of the Transportation Act of 1920, 49 U. S. C. A., sec. 71 et seq., Comp. Stats., sec. 10071½ et seq. (sec. 14 of the Transportation Act of 1920), empowered the Interstate Commerce Commission to fix minimum rates, and this power has been upheld by the United States supreme court in numerous cases, among which are: *Adair* v. *United States*, supra; *Akron, Canton & Youngstown Ry. Co.* v. *United States*, 261 U. S. 184, 67 L. Ed. 605, 43 Sup. Ct. Rep. 270; *Dayton-Goose Creek R. Co.* v. *United States*, supra.

So that it would seem that if Congress may empower the Interstate Commerce Commission to fix precise rates, without contravening the provisions of the Fifth Amendment, the state may, as to a public utility doing business wholly within the state of Montana, do likewise without violating the provisions of the Fourteenth Amendment.

While it is true that "The general right to make a contract in relation to his business is part of the liberty of the individual protected by the 14th Amendment of the federal Constitution" (*Lechner* v. *New York*, 198 U. S. 45, 49 L. Ed. 937, 25 Sup. Ct. Rep. 539), and that "the right of the owner to fix a price at which his property shall be sold or used is

an inherent attribute of the property itself" (*State Freight Tax Case*, 15 Wall. (U. S.) 232, 278, 21 L. Ed. 146, 163), that "included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property" (*Coppage* v. *Kansas*, 236 U. S. 1, 14, L. R. A. 1915C, 960, 59 L. Ed. 441, 446, 35 Sup. Ct. Rep. 240), and "that the Constitution provides that 'no person shall be deprived of life, liberty, or property without due process of law'; and we have recently held that the right to contract with reference to one's own labor is a property right, and cannot be taken away by mere legislative enactment" (*Carrollton* v. *Bazette*, 159 Ill. 284, 31 L. R. A. 522, 42 N. E. 837; *Ritchie* v. *People*, 155 Ill. 98, 46 Am. St. Rep. 315, 29 L. R. A. 79, 40 N. E. 454), yet this right guaranteed by the Constitution is not unlimited, but may be abridged or dispensed with altogether, for the constitutional guarantee is that no one shall be deprived of it "*without due process of law.*"

In the case of *Frisbie* v. *United States*, 157 U. S. 160, 39 L. Ed. 657, 15 Sup. Ct. Rep. 586, Mr. Justice Brewer, speaking of the meaning to be placed upon the word "liberty" as found in the federal Constitution with reference to the right of legislatures to place restrictions upon the right of contract, has this to say: "While it may be conceded that, generally speaking, among the inalienable rights of a citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the admitted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract, relieving himself from negligence; and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every

citizen has a right freely to contract for the price of his labor, services or property."

In the *Dartmouth College Case,* 4 Wheat. 518, Mr. Webster thus defines due process of law: "The general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial." The difficulty in defining precisely what is meant by due process of law was fully appreciated by Mr. Justice Miller of the supreme court of the United States, when he said, in *Davidson* v. *New Orleans,* 96 U. S. 97, 24 L. Ed. 616: "There is wisdom, we think, in the ascertaining of the intent and application of such an important phrase in the federal Constitution by the gradual process of judicial inclusion and exclusion as the cases presented for decision shall require, with the reasoning on which such decisions may be founded."

To the same effect is *Holden* v. *Hardy,* 169 U. S. 366, 42 L. Ed. 780, 18 Sup. Ct. Rep. 383; 6 R. C. L., p. 433, sec. 430, and cases there cited.

It may be said that the statute in question is a general law, in that it affects all utilities alike. It is a law "which hears before it condemns," because a hearing and notice of that hearing is provided for therein. That it "proceeds upon inquiry and renders judgment only after trial," is true of our statute, and that is just what was done before the order complained of was made.

The Utility does not claim that the rates fixed by the Commission are confiscatory; nor may it be said that the Utility is denied the equal protection of the laws. The Utility contends merely for its alleged constitutional right of determining the charge to be made by it so long as that rate or charge does not exceed the maximum fixed by the Commission. The assertion of its alleged right of competition in the instant case amounts to what? In other words, what is the end which it seeks to attain thereby? Is it not that it may carry on a rate war to a successful conclusion? Which is another way of saying that the termination of this rate war will mean the elimination of either the Utility or the Company by either

the one or the other having reached the end of its resources, or that the one will be taken over or swallowed up by the successful combatant. When this battle of rates is over, the charges made by the victor may not be fixed sufficiently high so as to enable it to recoup the losses entailed by the rate war (*Public Utility Commrs.* v. *New York Telephone Co.,* 271 U. S. 23, 70 L. Ed. 808, 46 Sup. Ct. Rep. 363), for those rates must remain, before the rate war as well as thereafter, according to the mandate of the statute, "just and reasonable," based upon a fair return on the investment in the property necessary to be used, and used, by the Utility in furnishing its product to the consumer. True, the public will have gained a temporary advantage through the lowering of prices, but that the same public will lose in the long run is a matter of common experience. In the *Mapleton Case,* supra, the supreme court of Iowa aptly says: "A public utility, operating under a franchise, has no constitutional right of competition. Moreover, a rate war is not necessarily competition. It may be, and usually is, a mere fight, which bodes nothing to the public but disorder and disorganization. The business of a public utility, under statutory regulation, becomes, by force of the statute, a legal monopoly. The power of statutory regulation is not affected; nor is the character of the business, as a monopoly, changed by the fact that two franchises are granted and accepted by the respective companies, each of which tenders its service to the patrons. The advantage of a monopoly is its economy. Though there be a splitting of this benefit where the business is divided between two franchise holders, the evil of monopoly in unregulated enterprises is wholly avoided by statutory regulation."

As hereinbefore noted, the complaint alleges that sections 3907 and 3908, Revised Codes 1921, contravene the provisions of the Fourteenth Amendment to the federal Constitution. This point was not mentioned in oral argument, and is not alluded to in the respondent's brief, and therefore we conclude that it has been abandoned.

We are of the opinion that the power conferred by our statute upon the Commission to fix precise rates does not contravene the provisions of the Fourteenth Amendment to the Constitution of the United States.

It follows that the judgment of the trial court is reversed, and the cause remanded to the district court of Lewis and Clark county for further proceedings not inconsistent with the views herein expressed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, GALEN and FORD concur.

Rehearing denied November 25, 1930.